**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-23501-CIV-GAYLES/D'ANGELO**

**LARRY F. PRATT,**

**Plaintiff,**

**vs.**

**FIFTH THIRD BANK, N.A.,**

**Defendant.**
______________________________/

**REPORT AND RECOMMENDATION**
**GRANTING DEFENDANT'S MOTION TO DISMISS**

**THIS CAUSE** is before the Court on Defendant's Motion to Dismiss the First Amended Complaint filed on April 2, 2026 (DE 63).[1] Plaintiff filed his response in opposition on April 16, 2026 (DE 64), and Defendant replied on April 23, 2026 (DE 69). Defendant filed a notice of supplemental authority on June 17, 2026 (DE 92), and Plaintiff filed a response to the Notice on June 19, 2026 (DE 93). Having considered the Parties' arguments, the relevant legal authorities, and the pertinent portions of the record, and being otherwise fully advised in the premises, for the reasons stated below, it is respectfully recommended that Defendant's Motion to Dismiss be **GRANTED**.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

This case is the latest in over fifteen years of litigation between the Parties regarding an unpaid loan. According to the allegations in the First Amended Complaint and its attachments, in 2006, Masters Group International, Inc. ("Masters"), a Delaware entity headquartered in Michigan, sought to acquire an existing office products business based in the United Kingdom and expand

[1] This case was referred to the undersigned Magistrate Judge for all pre-trial, non-dispositive matters, discovery, and for a Report and Recommendation on any dispositive matters (DE 44).

its operations into North America (DE 60 ¶ 5 n.1; DE 60-1 at 3). To that end, Masters borrowed money from Butte Local Development Corporation ("BLDC") and nearly $9 million from Comerica Bank ("Comerica"), to which Fifth Third Bank, N.A. ("Fifth Third Bank") is the successor by merger (DE 60 ¶¶ 5 n.1, 23 n.3; DE 60-1 at 3). Plaintiff Larry F. Pratt executed a guaranty on behalf of Masters in favor of Comerica with collateral pledged from brokerage accounts he owned (DE 60-1 at 3). Masters did not satisfy the loan when it became due, and after further iterations of the loan agreement increasing both the principal and the repayment term, Plaintiff executed a third guaranty ("The Pratt Guaranty"), securing a $10.5-million-dollar loan by Comerica to Masters in November 2008 (DE 60 ¶ 5; DE 60-1 at 3). The Pratt Guaranty contained Michigan choice-of-law and jury trial waiver provisions (DE 60 ¶ 15 n.2; DE 60-1 at 4). The Pratt Guaranty also contained a "reinstatement" clause that created liability for Plaintiff if "any payment received or credit given by the Bank in respect of the Indebtedness is returned, disgorged, or rescinded under any applicable state of referral law . . . ." (DE 60 ¶¶ 15, 44, 48; DE 60-1 at 19).

On November 1, 2008, the loan again became due, and the Parties negotiated a Forbearance Agreement, whereby Comerica agreed to forbear the loan until February 16, 2019 (DE 60 ¶¶ 6, 34; DE 60-1 at 4-5). Based on the agreement, a signature was required from another guarantor, Michael M. Vlahos, for the Forbearance Agreement to be executed (DE 60-1 at 5). Upon hearing that Vlahos was unavailable to sign the agreement, Karl Norton, Comerica's Vice President, replied "[t]hat's fine" (DE 60-1 at 5). The Parties disagreed about whether the Forbearance Agreement ever became effective, and Comerica, treating the Forbearance Agreement as never fully executed and therefore not binding, began seizing collateral for the defaulted loan on December 29, 2008 (DE 60 ¶¶ 7, 44; DE 60-1 at 6). Specifically, Comerica set off funds held in a Pratt account at Comerica in the amount of $8,052,224.57 and an additional $941,568.55 from

the Pratt collateral, including certain hedge funds (DE 60-1 at 6). Comerica also claimed $96,033.85 from Masters' Comerica account, $506,704.77 from another guarantor, and $1 million from two letters of credit (*id.*). The seizure of assets resulted in a recall of Masters' payroll checks and payments to suppliers and precipitated the collapse of its operations in the United States (DE 60 ¶ 53; DE 60-1 at 6). Masters was still indebted to Comerica after the seizure of Plaintiff's collateral, causing Comerica to initiate the first of several lawsuits (DE 60 ¶ 8).

**A. The Prior Litigation**

Comerica filed the first lawsuit against Plaintiff on March 30, 2009 in the United States District Court for the Western District of Michigan to collect outstanding money owed on the defaulted loan ("*Comerica I*") (DE 60 ¶ 30; DE 60-1 at 6). Comerica voluntarily dismissed its claim on May 11, 2009, after Plaintiff paid the remaining balance on the loan (DE 60 ¶ 31). In 2011, BLDC filed suit against Masters on its $200,000 debt in Montana state court (DE 60 ¶ 33; DE 60-1 at 9). In response, Masters filed a third-party complaint against Comerica on its own behalf and as Plaintiff's assignee for breach of the Forbearance Agreement ("*Masters I*") (DE 60 ¶ 34). Comerica lost *Masters I*, and the Montana state court entered a final judgment against Comerica in Masters' favor for $54,037,593.00 plus post-judgment interest (DE 60 ¶ 9). Comerica appealed, and the Montana Supreme Court ordered a retrial based on the application of Michigan, rather than Montana, law (DE 60 ¶¶ 9-10). Following a retrial and another appeal, Masters obtained a judgment of "approximately $21,000,000" against Comerica, which was affirmed by the Montana Supreme Court on July 6, 2021 ("*Masters II*") (DE 60 ¶ 11); *see also Masters Grp. Int'l, Inc. v. Comerica Bank*, 491 P.3d 675 (Mont. 2021).

On October 26, 2021, Comerica sued Plaintiff in federal court in Michigan, arguing that payment of the judgment in *Masters II* triggered the reinstatement provision of the Pratt Guaranty

("*Comerica II*") (DE 60 ¶ 15; DE 60-1 at 13). Specifically, Comerica argued that, when it "wired $20,951,362.34 to Masters' attorney's trust account (i.e., $10,500,000 plus interest)" in satisfaction of the judgment in *Masters II*, it had "returned, disgorged or rescinded" the collateral it had received with respect to Masters' indebtedness, triggering Section 7 of the Pratt Guaranty and reinstating Pratt's obligations as guarantor of the loan to Masters (DE 60-1 at 12, 19; *see* DE 60 ¶¶ 15, 44). The district court granted summary judgment for Plaintiff in *Comerica II*, holding that "the damages were not a return of the collateral but an independent payment, a payment made as a consequence for the manner in which Comerica seized the collateral" (DE 60 ¶ 44). Comerica appealed, and the United States Court of Appeals for the Sixth Circuit affirmed the district court's ruling on May 5, 2025 (DE 60 ¶ 19; DE 60-4).

### B. The Instant Case

On August 5, 2025, Plaintiff filed the instant lawsuit (DE 1). The First Amended Complaint asserts a sole claim of malicious prosecution, stemming from "*Comerica II* and the 6th Circuit Appeal" and alleges damages of "attorneys' fees and costs" and "non-economic damages . . . including stress, confusion, uncertainty, and . . . fear" from the that litigation (DE 60 ¶¶ 80-81). Plaintiff alleges that Defendant pursued him "for a debt which it knew and acknowledged had been paid more than a decade earlier and did so under a legal theory that had already been addressed and rejected by" courts in various forums (DE 60 ¶ 2). Defendant now moves to dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting under Michigan law Plaintiff failed to state a claim for malicious prosecution (DE 63 at 6-7).

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citation omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (citation omitted). On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

## III. DISCUSSION

Defendant seeks dismissal of Plaintiff's First Amended Complaint, arguing that Michigan law applies to Plaintiff's sole claim of malicious prosecution, which requires a plaintiff to allege a "special injury" (DE 63 at 6-7). According to Defendant, Plaintiff fails to allege any special injury, and therefore, his malicious prosecution claim fails (DE 63 at 19-20; DE 69 at 8). Defendant also argues that Plaintiff fails to plausibly allege the absence of probable cause, which is also fatal to Plaintiff's claim (DE 63 at 20-22). Lastly, Defendant claims that the First Amended Complaint is a shotgun pleading, and amendment would be futile (DE 63 at 22-25; DE 69 at 11).

Plaintiff responds that Defendant seeks to relitigate issues already settled by prior litigation (DE 64 at 6-7). According to Plaintiff, the courts in *Comerica II* and the subsequent appeal to the Sixth Circuit "decided the merits of those cases in favor of Pratt," which confirmed Comerica had no "legal basis" to initiate that litigation in the first place (DE 64 at 14). Plaintiff argues that he "is entitled to the use of offensive issue preclusion" on that issue, which establishes that such

claims were brought without probable cause (DE 64 at 12-13). According to Plaintiff, Florida law, not Michigan law, governs his claim, and Plaintiff asserts that he has adequately alleged all elements of malicious prosecution under Florida law (DE 64 at 23-25). Plaintiff also disputes Defendant's characterization of the First Amended Complaint as a shotgun pleading (DE 64 at 15-16). The Court addresses each of these arguments in turn, taking the last argument first.

**A. The First Amended Complaint is Not a Shotgun Pleading**

"Rule 8(a)(2) requires a complaint to include 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). Under Rule 10(b), "A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. . . . [E]ach claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." Fed. R. Civ. P. 10(b). "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland*, 792 F.3d at 1320. The Eleventh Circuit recognizes four types of shotgun pleadings:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type . . . is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.

*Id*. at 1321-23. "A dismissal under Rules 8(a)(2) and 10(b) is appropriate where 'it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" *Id*. at 1325 (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)). "What matters is function, not form: the key is whether the plaintiff had fair notice of the defects and a meaningful chance to fix them." *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018).

Defendant argues that the First Amended Complaint is a shotgun pleading, because it "incorporates by reference all of the [First Amended Complaint's] other paragraphs" (DE 63 at 22). Next, Defendant argues that the First Amended Complaint's allegations concerning (1) issue preclusion; (2) Comerica's purported admissions in the *Masters* litigation; (3) Pratt's victory in *Comerica II* and the Sixth Circuit appeal; and (4) the Montana Supreme Court's characterization of Comerica's arguments in *Masters*, are "conclusory, vague, and immaterial facts not obviously connected to any particular cause of action" (DE 63 at 22-25). Plaintiff responds that the "First Amended Complaint is not a shotgun pleading simply because it incorporates the background allegations into its sole cause of action" (DE 64 at 8).

Contrary to Defendant's assertion, the First Amended Complaint is not a shotgun pleading. Rather, a shotgun pleading is one "where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Weiland*, 792 F.3d at 1321. Here, Plaintiff brings *a single count for malicious prosecution*, so there are no successive counts to incorporate. *Id*. Second, the allegations in the First Amended Complaint do not make it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief" and are "informative enough to permit a court to readily determine if they state a claim upon which relief can be granted."

*Weiland*, 792 F.3d at 1325-26 (citation omitted); *see also Patsalides v. City of Fort Pierce*, No. 15-CIV-14431, 2016 WL 11503007, at *3 (S.D. Fla. Aug. 12, 2016) ("Counts I, III, V, and VII are not a model of efficiency or specificity, but they do adequately put Defendant on notice of the specific claims against it and the factual allegations that support those claims."). The Court can discern which factual allegations support Plaintiff's sole cause of action, regardless of whether conclusory, vague, or immaterial facts are interspersed therein, and Defendant has fair notice of the claim against it. This argument therefore fails to provide a compelling basis to dismiss the First Amended Complaint.

### B. The First Amended Complaint Fails to State a Claim for Malicious Prosecution

Next, Defendant argues that Plaintiff fails to state a claim for malicious prosecution. As an initial matter, the Parties dispute whether Michigan or Florida law applies to the malicious prosecution claim. The Parties agree, however, that Michigan and Florida law require different elements to set forth such a claim (*see* DE 63 n. 10 ("Unlike Michigan, Florida law does not require a special injury."); DE 64 at 24 ("Unlike Michigan, Florida does not require proof of 'special injury.'")); *compare Friedman v. Dozorc*, 312 N.W.2d 585, 595 (Mich. 1981) ("[U]nder Michigan law special injury remains an essential element of the tort cause of action for malicious prosecution of civil proceedings.") *with Debrincat v. Fischer*, 217 So. 3d 68, 70 (Fla. 2017) (listing elements of malicious prosecution under Florida law, which do not include special injury). As a result, the Court must start with a choice-of-law analysis to determine the applicable law and then evaluate whether Plaintiff's allegations in the First Amended Complaint are sufficient to state a claim.

#### 1. Choice-of-Law Analysis

"In determining which law applies, a federal district court sitting in diversity must apply the choice of law rules of the forum state." *Trumpet Vine Invs., N.V. v. Union Cap. Partners I,*

*Inc.*, 92 F.3d 1110, 1115 (11th Cir. 1996) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941)). The conflict-of-law rule in Florida regarding torts, such as malicious prosecution, was set forth in *Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999 (Fla. 1980). In *Bishop*, the Florida Supreme Court abandoned the mechanical application of the *lex locus delecti* doctrine, which required the law of the state where the tort occurred be mechanically applied, and "adopt[ed] the 'significant relationships test' as set forth in the Restatement (Second) of Conflict of Laws §§ 145-146 (1971) . . . ." *Id.* at 1001; *see also Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1567 (11th Cir. 1990) (stating under *Bishop*, "conflicts questions, including those which involve questions of tort, should henceforth be decided with reference to the principles delineated in the Restatement (Second) of Conflicts of Laws (1971)."); *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) ("Florida resolves conflict-of-laws questions according to the 'most significant relationship' test outlined in the Restatement (Second) of Conflict of Laws." (citing *Bishop*, 389 So. 2d at 1001)).

There are three sections of the Restatement that inform the choice-of-law analysis for a malicious prosecution tort claim. "The Restatement . . . provides a 'General [Tort] Principle' in [S]ection 145 that is intended to inform courts as they apply the more specific 'Choice of Law Principles' outlined in [S]ection 6." *Grupo Televisa*, 485 F.3d at 1240. Additionally, the Restatement "provides certain specific presumptions in [designated tort] cases that must be considered before applying the most significant relationship test." *Middleton v. The Hollywood Rep. LLC*, 137 F.4th 1287, 1296 (11th Cir. 2025) (analyzing the Restatement's specific guidance for the tort of defamation); *see also Engel v. Buchan*, 791 F. Supp. 2d 604, 609 (N.D. Ill. 2011) (recognizing a "rebuttable presumption" that law of the state where proceedings commenced applies). Section 155 of the Restatement applies specifically to malicious prosecution cases:

> The rights and liabilities of the parties for malicious prosecution or abuse of process are determined by the local law of the state where the proceeding complained of occurred, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws: Malicious Prosecution and Abuse of Process § 155 (1971). The comments to Section 155 recognize that it is a "rare situation[]" where "some state other than that where the proceeding complained of occurred is the state of most significant relationship . . . ." Restatement (Second) of Conflict of Laws: Malicious Prosecution and Abuse of Process § 155 cmt. b (1971). In other words, Section 155 directs courts to presume that the law of the state where the proceeding occurred governs, which is Michigan in this case, "unless, . . . some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties." Restatement (Second) of Conflict of Laws § 155. After considering the presumption in Section 155, courts turn to the significant relationships test in Section 145 to evaluate the relevant contacts various states have with the occurrence and the parties and then use the factors set forth in Section 6 to determine whose contacts are most significant.

Section 145 "lays out the basic principle for tort actions and [S]ection 145(2) lists four 'contacts' that courts should consider in the course of applying the specific Choice of Law Principles under [S]ection 6." *Grupo Televisa*, 485 F.3d at 1240. Section 145 states:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> > (a) the place where the injury occurred,
> > (b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws: The General Principle § 145 (1971). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Judge*, 908 F.2d at 1568.

**a. Contacts of Interested States**

Defendant argues that the first two contacts in Section 145(2) point to Michigan (DE 14-16). Specifically, Defendant relies on *Korman v. Kent*, 821 So.2d 408 (Fla. Dist. Ct. App. 2002) and *In re Davis*, 99 B.R. 95 (M.D. Fla. Bankr. 1989) for the proposition that in malicious prosecution cases, both the conduct and injury coincide with the state where the litigation was filed (DE 63 at 15-16; DE 69 at 5). Defendant also distinguishes the place of injury from the place where Plaintiff suffered damages (DE 92). Plaintiff concedes that the place where the conduct causing the injury occurred is Michigan (DE 64 at 17 ("The second factor favors Michigan . . . .")). But, Plaintiff maintains that "Pratt's injuries (economic losses and stress) were suffered in Florida" (DE 64 at 16-17). Plaintiff also challenges Defendant's reliance on *Korman*, because that case addressed a challenge to personal jurisdiction, rather than a choice-of-law analysis (DE 64 at 21). And Plaintiff distinguishes *Davis* by pointing out that Georgia law was appropriate in that case in part because "each lawsuit was based on a lending relationship existing entirely in Georgia while Plaintiff was a Georgia resident" (DE 64 at 21). Plaintiff argues that there are no analogous facts present in this case.

Turning first to the place where the injury occurred, as Defendant correctly points out, Plaintiff "does not cite a single case in which a court held that a malicious prosecution injury did not occur where the offending suit was filed" (DE 69 at 5-6). Indeed, the commentary to Section

145 provides that "the place of injury is of particular importance in the case of . . . malicious prosecution and abuse of process (see § 155)." Restatement (Second) of Conflict of Laws: The General Principle § 145 cmt. f (1971). Comment f's reference to Section 155, which presumes application of the state's law where the malicious prosecution occurred, suggests that the state where the proceeding occurred is also the place of injury. Restatement (Second) of Conflict of Laws: The General Principle § 145 cmt. f (1971). Plaintiff argues that the injury occurred in Florida, because Plaintiff suffered economic losses and stress in Florida, resided in Florida during the *Comerica II* litigation, paid legal bills in Florida, and had Plaintiff been found to have any additional obligations, his performance would have occurred in Florida (DE 64 at 16-17). Yet, Plaintiff provides no legal authority to support his argument that in a malicious prosecution case, the place where the injury occurred is the place where the plaintiff resides, because that is where the plaintiff will most practically feel the effects of the ill-intended litigation.

Contrary to Plaintiff's argument, courts applying the significant relationships test have found that the place of the proceedings coincides with the place of injury for malicious prosecution claims. *See Turner v. Boyle,* 116 F. Supp. 3d 58, 76 (D. Conn. 2015) ("The criminal proceedings referenced in Turner's complaint all took place in Connecticut. Moreover, the conduct giving rise to Turner's alleged injury, and the injury itself, occurred in Connecticut.");[2] *Hammervold v. Blank*, No. 20-CIV-165, 2020 WL 4535914, at *3 (E.D. Tex. Aug. 6, 2020), *rev'd and remanded on other grounds,* 3 F.4th 803 (5th Cir. 2021) ("The alleged injury—the underlying lawsuit that gave rise to the present action—occurred in federal court in Texas, as did the conduct causing the alleged

[2] Plaintiff correctly notes that the *Turner* court did not find a conflict between Connecticut and New Jersey law with respect to the malicious prosecution claims, and thus, its Section 145 analysis is not determinative of the result in that case. *Turner v. Boyle*, 116 F. Supp. 3d 58, 76 (D. Conn. 2015) ("[T]here is no conflict between Connecticut and New Jersey common law with respect to malicious prosecution claims.").

injury.").[3] Even if procedural events of the same underlying proceeding took place in different states, courts have applied the law of the state where the proceeding was initiated. *See Burwell v. Virginia Acme Markets, Inc.*, 355 F. Supp. 784, 787 (S.D.W. Va. 1973) (finding in a case where the action was initiated in Virginia, the arrest occurred in West Virginia, and the individual was transported back to Virginia and released on bond before a Virginia judge dismissed the case, "Virginia unquestionably ha[d] a natural interest in determining the extent its legal processes may be inhibited by the possibility that a person making use of these processes will be held liable for malicious prosecution[,]" even though "injury may well have occurred in both neighboring states, particularly in relation to plaintiff's reputation"). The persuasiveness of this legal authority, which routinely points to the place where the underlying proceedings occurred as the place of injury, stands in stark contrast to the absence of authority provided by Plaintiff.

Defendant also relies on *Korman* and *SpaceCo* to support its position on the place of injury. In those cases, the court found no personal jurisdiction, because the tort occurred in the state "where the action is maliciously filed or maintained." *Korman*, 821 So. 2d at 410; *see also SpaceCo Bus. Sols., Inc. v. Mass Engineered Design, Inc.*, 942 F. Supp. 2d 1148, 1155 (D. Colo. 2013) ("[T]he naming of [plaintiff] as a defendant in a Texas lawsuit . . . is insufficient to establish

---

[3] Plaintiff's attempt to distinguish *Hammervold* fails. The court there had to choose between the application of Texas and Illinois law. *Hammervold*, 2020 WL 4535914, at *3. Plaintiff claims that the party advocating for Illinois law did so because he "had *now* moved to and practiced law in [Illinois]—but did not at the time of the underlying suit" (DE 64 at 19 n.14). This is a distinction without a difference; "[i]n fact, at the time the actions giving rise to [the plaintiff's] alleged injury occurred, he lived and worked in Tennessee, not Illinois." *Hammervold*, 2020 WL 4535914, at *3 (internal citation omitted). The location where the plaintiff lived and worked therefore had little bearing on the court's determination of where the injury occurred. And Plaintiff is simply incorrect that the *Hammervold* court "was applying Section 145 instead of Section 155" (DE 64 at 19 n.14). *See Hammervold*, 2020 WL 4535914, at *n.4 ("On top of that, § 155 of the Restatement (Second) of Conflicts of Laws has specific rules with respect to malicious prosecution and abuse of process claims. . . . Because 'the proceeding complained of'—the initial lawsuit brought by [defendants]—occurred in Texas, Texas substantive law governs the present case.").

that [defendants] have the required minimum contacts with Colorado such that being haled into court in Colorado would not offend traditional notions of fair play and substantial justice."). *Korman* and *SpaceCo* rejected similar arguments that the injury occurred in the plaintiff's place of residence, because the plaintiff felt the consequences of the litigation at home. *See SpaceCo Bus. Sols., Inc.*, 942 F. Supp. 2d at 1154 ("The fact that litigation costs attendant to the Texas litigation might have been paid out of SpaceCo's home office in Colorado is an incidental consequence of an injury that occurred in Texas."); *Korman*, 821 So. 2d at 410 ("The mere fact that the aggrieved party brings his distress and economic consequences with him when he returns from defending in that distant state back to Florida does not extend the tort to being committed in Florida."). Plaintiff asserts that these cases are inapposite, because the relevant issue for the Court's consideration was a challenge to personal jurisdiction, not a choice-of-law analysis. True, these cases do not guide the Court with respect to the legal framework for its choice-of-law analysis, but Plaintiff does not explain why the reasoning of these courts regarding how to conceptualize the place of injury for a malicious prosecution claim should not be persuasive, particularly where that reasoning comports with other courts' choice-of-law analysis for this type of claim.

In accordance with the great weight of authority, the place where the injury occurred under the circumstances of this case is the place where the lawsuit was filed, Michigan. There is no doubt that Plaintiff brought stress and economic burdens resulting from the *Comerica II* litigation back to Florida with him, or that he continued to maintain his residence and daily activities in Florida; those are incidental consequences to the injury that first occurred in Michigan. Nor does Plaintiff dispute that the place where the conduct causing the injury occurred is Michigan. The first and second factors point to the application of Michigan law.

Moving to "the domicile, residence, nationality, place of incorporation and place of business of the parties," the Parties agree that Plaintiff was domiciled in Florida at the time of the *Comerica II* litigation, and Comerica was domiciled in and a citizen of Texas (DE 63 at 16). Thus, both Florida and Texas seemingly had interests in the application of their laws. As Plaintiff notes, Florida's interest includes protecting its citizens from malicious prosecution and providing an avenue of compensation under its laws when such a tort has been committed. *See Wilson v. O'Neal,* 118 So. 2d 101, 105 (Fla. Dist. Ct. App. 1960) ("[S]urely citizens should be given some protection against the irresponsible instituting against them of civil or criminal proceedings by other persons, even law enforcement officers."). Texas similarly has an interest in protecting its citizens and entities against deficient malicious prosecution claims. *See Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 290 (Tex. 1994) ("It is important that every citizen should be protected against malicious prosecutions . . . .") (citing *Sebastian v. Cheney,* 86 Tex. 497, 25 S.W. 691, 694 (1894)). Plaintiff asserts that Comerica, now Fifth Third Bank, is no longer a citizen of Texas but a citizen of Ohio following the merger, which could greatly diminish or completely extinguish Texas's interest in the application of its law and could give rise to such an interest on behalf of Ohio. Nevertheless, neither party argues that either Texas or Ohio has a predominate interest here.

Plaintiff attempts to amplify Florida's interest by arguing that "Comerica and now Fifth Third have *hundreds* of locations in Florida" (DE 69 at 6 (emphasis in original)). The comments to the Restatement caution: "[t]he fact, for example, that one of the parties is domiciled or does business in a given state will usually carry little weight of itself. On the other hand, the fact that the domicil and place of business of all parties are grouped in a single state is an important factor to be considered in determining the state of the applicable law." Restatement (Second) of Conflict of Laws: The General Principle § 145 cmt. e (1971). To be sure, Plaintiff is correct that Florida

has *some interest* in its law being applied to Plaintiff's claim, but the fact that Plaintiff resided in Florida and Defendant had some banking locations in Florida does not tip the scale so significantly in Florida's favor. *See Turner v. Boyle*, 116 F. Supp. 3d 58, 76 (D. Conn. 2015) (application of Connecticut law was appropriate even where the defendant was a citizen of New Jersey).

The final contact in Section 145(2) considers the place where the relationship between the parties is centered. Defendant argues that the only relationship between the Parties relevant to the malicious prosecution claim was the relationship perpetuated by the Pratt Guaranty which, as discussed in *Comerica II*, was a Michigan contract containing a Michigan choice-of-law provision (DE 63 at 16-17; DE 69 at 6-7). Defendant asserts that choice-of-law provision survives termination or discharge of an agreement and disputes Plaintiff's position that "the Pratt Guaranty is a Florida relationship because 'that is where Pratt's guaranty was to be performed'" (DE 69 at 7; *see* DE 63 at 17). Plaintiff responds that perhaps the relationship of the Parties was centered in Michigan "in 2008 or 2009—prior to Pratt's satisfaction of his guaranty," but "[b]y 2009, the contract upon which Comerica relied in choosing to sue Pratt in Michigan was satisfied and extinguished" (DE 64 at 18 n.12). Additionally, while conceding that the Pratt Guaranty did contain a Michigan choice-of-law clause, Plaintiff argues that "none of Pratt's claims here are based on the guaranty or require construction of the guaranty" (DE 64 at 22).

Plaintiff's claims that the Pratt Guaranty was extinguished and the Michigan choice-of-law provision was not part of the *Comerica II* litigation are unavailing, particularly when the relevant question is where the Parties' relationship was centered. Plaintiff seemingly acknowledges that the Parties' relationship flowed from the contracts between them, including the Pratt Guaranty. And Comerica's decision to file suit based on the reinstatement clause in the Pratt Guaranty was the foundation for the alleged malicious litigation. In fact, the Michigan choice-of-law provision

reveals that the Parties elected for a Michigan forum to interpret the Pratt Guaranty, which governs the Parties' dealings and is the basis for the malicious prosecution claim. *See Engel v. CBS Inc.*, 981 F.2d 1076, 1081 (9th Cir. 1992) ("While California does have an interest in whether the civil action filed by CBS amounted to malicious prosecution, this interest is diminished by the fact that Engel and his client availed themselves of the New York forum by agreeing that the CBS record contract would be governed by New York law."). Regardless of whether the Parties' obligations have been fulfilled under the Pratt Guaranty, the litigation upon which the malicious prosecution claim is based was filed and adjudicated in Michigan.[4] And Plaintiff again cites no legal authority to support his theory that an obligee's payment on a contract from his home state demonstrates that the relationship between the Parties is centered in that state.

Overall, the significant relationships test in Section 145 reveals that Michigan has more contacts with the issues presented by this litigation and the Parties than Florida. But the analysis does not end there. Having identified the contacts of Section 145 that support either Michigan or Florida law, "we cannot simply add up the factors delineated in section 145(2) and then apply the law of the sovereign with the greatest numerical total. Rather, we must, as mandated by section 145(1), turn to the factors delineated in section 6 to determine which sovereign has the most significant contact." *Judge*, 908 F.2d at 1569 (citations omitted).

---

[4] Plaintiff's argument that the Pratt Guaranty was extinguished by 2009 is unconvincing. Many courts have explicitly upheld the principle that dispute resolution provisions survive termination of their attendant contracts. *See Sensify (US) Inc. v. Intelligent Telematics N. Am., Inc.*, No. 16-CIV-24069, 2017 WL 1541424, at *2 (S.D. Fla. Apr. 28, 2017) ("[C]ourts consistently have rejected the notion that termination of an agreement necessarily extinguishes its forum-selection clause.") (collecting cases). This is true "even where the contract expressly provides for the survival of certain enumerated provisions but not the forum-selection clause." *Id.*; *see also Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 857 (11th Cir. 2016) ("While contractual obligations may expire upon the termination of a contract, provisions that are structural (e.g., relating to remedies and the resolution of disputes) may survive that termination.").

**b. Evaluation of the Most Significant Relationships**

Since the alleged malicious prosecution took place in Michigan, the Court turns to Section 6 to determine whether this case presents one of those "rare situations" where Florida has a more significant relationship to the dispute than Michigan. Section 6 lists the following factors as relevant to determining the applicable law:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971). "The commentary to this section cautions that the factors are not listed in order of relative importance and that varying weight will be given to particular factors in different areas of law." *Grupo Televisa*, 485 F.3d at 1243.

Defendant does not offer a factor-by-factor analysis under Section 6 but points to cases applying those factors to arrive at the conclusion that "the choice of law for malicious prosecution claims is the state where the offending proceeding was filed" (DE 69 at n.4). Defendant also relies on a string cite of cases that "conclude the choice of law for malicious prosecution claims is the state where the offending litigation was brought," but fails to identify how those courts interpreted the Section 6 factors (DE 69 at 8 (citing DE 63 at 13 n.9)). Plaintiff, on the other hand, discusses the Section 6 factors, explaining that "factors a, b, c, e, and g favor applying Florida law" but fails to include any argument regarding factors (d) or (f) (DE 64 at 22). Specifically, Plaintiff argues that factor (a), the needs of the interstate and international systems, favors Florida, because "the interstate system requires that a bank that does business in a state with a resident of that state should be expected to be subject to the laws of that state when it wrongs that state's resident" (*id.*).

Factors (b), (c), and (e) each favor Florida according to Plaintiff, because "Florida's interest is in protecting its residents—not applying the law of a distant forum with very little relationship to a dispute to bar a suit by a Florida resident" (DE 64 at 22-23). Lastly, factor (g), the ease in determination of the law to be applied, favors Florida, because "this Court certainly has more familiarity with Florida law than with Michigan law" (DE 64 at 23).

Here, the Section 6 factors ultimately call for the application of Michigan law. Indeed, the needs of the interstate system require courts to account for "the states' common interest in respecting each other's right to police the use of its own courts." *Gradient Analytics, Inc. v. Biovail Corp.*, No. 10-CIV-0335, 2010 WL 2991573, at *5 (D. Ariz. July 26, 2010) (examining factor (a) of Section 6 in a choice-of-law analysis for a malicious prosecution claim). Regarding factors (b), (c), and (e), Plaintiff claims that "Florida's interest is in protecting its residents" from malicious prosecution, which outweighs any other state's interest (DE 64 at 22-23). Factors (b), (c), and (e) examine the competing policy interests of the states whose laws might be applied. While Florida has an interest in whether the civil action filed by Defendant amounted to malicious prosecution, that interest is diminished by Michigan's interest, who legal process was allegedly misused. In other words, Florida's interest is "far less than if the litigation process in [Florida] were subject to misuse." *Engel*, 981 F.2d at 1081. Lastly, Michigan's interest in applying its law, which requires the pleading of special injury, would be obstructed by Plaintiff's attempt to circumvent that higher pleading requirement through the application of Florida law. *See id.* at 1082 ("If a plaintiff can circumvent [the special injury] requirement by filing his or her claim in a different forum, [that state's] policy of limiting malicious prosecution actions, based on [that state's] litigation, will be seriously impaired."); *see also Lamie v. Smith*, No. 12-CIV-201, 2013 WL 12109526, at *8 (W.D. Mich. Feb. 14, 2013), *report and recommendation adopted,* No. 12-CIV-201, 2013 WL 12109421

(W.D. Mich. Mar. 6, 2013) ("Malicious prosecution actions are disfavored by the Michigan courts, for the very reason that they encourage litigiousness and raise the specter of endless litigation. A plaintiff must therefore plead special injury . . . ."). Moreover, as discussed above, the principles underlying the relevant legal field point to the state where the action was filed, as embodied in Section 155 of the Restatement.

Factors (d) and (f), "the protection of justified expectations" and "certainty, predictability and uniformity of result" also weigh in favor of Michigan, because such a result would conform with the "heavy weight section 155 gives to the State where an alleged malicious action was filed in resolving choice-of-law questions." *Pitcock v. Kasowitz, Benson, Torres & Friedman, L.L.P.*, 46 A.3d 586, 591 (N.J. Super. App. Div. 2012); *Gradient*, 2010 WL 2991573, at *5 ("Factor (d), the protection of justified expectations, slightly favors New Jersey law because a party could reasonably expect the law of the state where he filed suit to govern a subsequent malicious prosecution claim. . . . Factor (f), certainty, predictability and uniformity of results, slightly favors applying the law of the state where the litigation occurred."). Factor (g), "the ease in determining and applying the law," is neutral or only slightly favors Florida, as this Court sits in Florida, but that fact "should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results." Restatement (Second) of Conflict of Laws § 6 cmt. j (1971); *see also Gradient*, 2010 WL 2991573, at *5 (finding factor (g) neutral in choice between Arizona and New Jersey law as applied by an Arizona district court).

After considering the specific presumption for malicious prosecution cases in Section 155, as well as the significant relationships test in Section 145 and the balancing of interests under Section 6, Michigan's interest in the application of its law predominates in this case. As discussed above, resolving the choice-of-law question here begins with the presumption in Section 155,

which requires the application of Michigan law unless this case presents one of those "rare situations" where Florida has a more significant relationship to this dispute after an analysis of the broad choice-of-law principles enumerated in Section 6. This is not one of those rare cases. Michigan's contacts with the occurrence and the Parties are substantial. And the majority of the Section 6 factors point toward the application of Michigan law. Factors that favor Florida "should not be overemphasized" and are not substantial enough to overcome the other considerations under the Restatement. Section 6 counsels in favor of the application of Michigan law here.

**2. The First Amended Complaint Does Not Sufficiently Allege Malicious Prosecution under Michigan Law**

Having determined that Michigan's malicious prosecution law applies, the Court turns to whether the First Amended Complaint states a claim for which relief can be granted (DE 60). Defendant argues that Plaintiff fails to plausibly allege facts sufficient to meet Michigan's heightened "special injury" requirement, and the First Amended Complaint also fails to allege the absence of probable cause (DE 63 at 18). Defendant argues that Plaintiff's damages in the First Amended Complaint consist only of "litigation expenses" and "emotional damages," which Michigan courts have held do not meet the special injury requirement (DE 63 at 19). Defendant also argues that any amendment to the First Amended Complaint is futile, because Plaintiff's allegations do not satisfy the special injury requirement under Michigan law, which is dispositive of Plaintiff's sole claim (DE 63 at 25; DE 69 at 11).

Under Michigan law, the elements of a malicious prosecution claim are: (1) a termination of prior proceedings in favor of the present plaintiff; (2) absence of probable cause for those proceedings; (3) malice; and (4) special injury. *See Friedman,* 312 N.W.2d at 603 (describing the elements of a malicious prosecution claim under Michigan law). "[A] plaintiff asserting malicious prosecution must establish that he or she suffered a 'special injury,' meaning an 'injury to one's

fame (as by a scandalous allegation), injury to one's person or liberty, and injury to one's property.'" *Abraham v. Incorp Servs., Inc.*, No. 342296, 2019 WL 1411172, at *4 (Mich. App. Mar. 28, 2019). Special injury "must be some injury which would not necessarily occur in all suits prosecuted for similar causes of action." *Moutsatsos v. City of Huntington Woods*, No. 327838, 2016 WL 6902024, at *3 (Mich. App. Nov. 22, 2016). Allegations that "fall short of being equivalent to a seizure of property" do not meet the special injury element. *Young v. Motor City Apartments Ltd. Dividend Hous. Ass'n No. 1 & No. 2*, 350 N.W.2d 790, 793 (Mich. App. 1984) (finding allegations of: (1) time and revenue lost while defending the lawsuit; (2) medical expenses for treatment of various illnesses and mental anguish related to defending the lawsuit; (3) public ridicule; (4) injury to reputation and goodwill, both private and professional; (5) costs incurred to defend against the lawsuit; (6) lost profits from accounts receivables that became uncollectable while defending the lawsuit; and (7) lost profits from the closing of a section of plaintiffs' business materially affected by the lawsuit were insufficient to show special injury).

In *Friedman*, the seminal case establishing the special injury requirement for malicious prosecution under Michigan law, the Michigan Supreme Court held that injuries including "the cost of defending" the litigation and "damages to [the plaintiff's] reputation[,] . . . embarrassment and continued mental anguish" did not "allege interference with his person or property sufficient to constitute special injury under Michigan law." *Friedman*, 312 N.W.2d at 588-89. Here, Plaintiff alleges that he suffered damages in the form of "time, energy, . . . attorneys' fees and costs" as well as "stress, confusion, uncertainty, and . . . fear" (DE 60 ¶¶ 60, 80-81). Based on *Friedman*, these allegations are insufficient to constitute special injury under Michigan law. *See*

312 N.W.2d at 588-89 (findings attorneys' fees and mental anguish do not meet the special injury requirement).[5]

Even more, Plaintiff cites no authority and *makes no argument* that the First Amended Complaint adequately alleges special injury under Michigan law. *See N.L.R.B. v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) (stating issues without supporting arguments and citation to authorities are generally waived). Instead, Plaintiff simply asserts that "attorneys' fees and costs and general damages are sufficient under Florida law" (DE 64 at 24). Florida law, however, does not apply, which proves fatal to Plaintiff's malicious prosecution claim. The special injury requirement under Michigan law is not addressed, and the First Amended Complaint lacks the necessary allegations to satisfy this element of Plaintiff's sole claim—a point that Plaintiff seemingly does not contest. Since the allegations in the First Amended Complaint do not satisfy at least one element, Plaintiff fails to state a claim for malicious prosecution.[6] The Court need not

---

[5] Michigan courts have described how exacting the special injury requirement is:

> It is the opinion of this court that, while these plaintiffs have alleged more than the expenses of defending the lawsuit, it would be inappropriate to treat their claim as alleging special injury under Michigan law. The allegations that a suit was brought solely to 'ruin' someone's business or reputation is an exceedingly subjective assertion which any litigant could pose and which could be verified or disproven only upon a trial of the issue. It is presumably for this reason that courts recognizing the special injury prerequisite demand that some 'objective' equivalent of a taking be alleged or, as in *Fedders,* that some 'provisional remedy' is alleged to have been utilized against plaintiff. Without such criterion, the stringent special injury rule, which the *Friedman* court has so carefully engrafted upon this cause of action, could be swallowed up by an allegation that the defendant 'was out to ruin me.' I do not believe that this was a result intended by the court in *Friedman.*

*Sage Int'l, Ltd. v. Cadillac Gage Co.*, 556 F. Supp. 381, 386 (E.D. Mich. 1982) (citations omitted).

[6] Plaintiff, who is represented by counsel, has not made a motion for leave to amend the operative complaint. Since there is not a request for this relief pending, the Court need not determine whether amendment would be futile. *See Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) ("A district court is not required to grant a plaintiff leave to amend his complaint *sua sponte* when the plaintiff, who is represented by counsel, never filed a motion to

reach Defendant's remaining arguments regarding Plaintiff' failure to state a claim based on deficient allegations in the First Amended Complaint.

## IV. CONCLUSION

Based on the foregoing, it is respectfully recommended that Defendant's Motion to Dismiss First Amended Complaint (DE 63) be **GRANTED**. It is further respectfully recommended that the sole count in the First Amended Complaint be **DISMISSED WITH PREJUDICE**. It is further respectfully recommended that this case be **CLOSED**.[7]

## V. OBJECTIONS

The parties will have fourteen (14) days from the date of this Report and Recommendation to file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in this Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report, except upon grounds of plain error, if necessary, in the interest of justice. 28 U.S.C. § 636(b)(1) (2009); *Thomas v. Arn*, 474

---

amend nor requested leave to amend before the district court."); *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1298 (11th Cir. 2025) ("We have held that '[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.'" (citation omitted)).

[7] Defendant's Motion for Sanctions remains pending before the Court and is fully briefed (DE 147). The District Court retains jurisdiction to adjudicate the Motion for Sanctions even if it dismisses this action in its sound discretion. *See Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020) ("[A] district court may address a sanctions motion based on its inherent powers or § 1927 even if it lacks jurisdiction over the underlying case."); *Freites C. v. Medina*, No. 25-CIV-20465, 2025 WL 4035364, at *5 (S.D. Fla. Dec. 24, 2025), *report and recommendation adopted sub nom. Freites v. Medina*, No. 25-CIV-20465, 2026 WL 92829 (S.D. Fla. Jan. 13, 2026) ("[E]ven after they no longer have jurisdiction, 'district courts retain jurisdiction to consider at least five different types of collateral issues: costs, fees, contempt sanctions, Rule 11 sanctions, and motions to confirm arbitral awards.'" (quoting *Absolute Activist Value Master Fund Ltd. v. Devine*, 998 F.3d 1258, 1266 (11th Cir. 2021))).

U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on this 20th day of November, 2026.

Ellen D'Angelo

ELLEN F. D'ANGELO
UNITED STATES MAGISTRATE JUDGE

cc: All Counsel of Record